NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1136n.06

No. 10-4145

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

**FILED**
*Nov 05, 2012*
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE SOUTHERN |
| v. | ) DISTRICT OF OHIO |
| | ) |
| FARID MOHAMMED, | ) |
| | ) AMENDED |
| Defendant-Appellant. | ) |

Before:     **KEITH, BOGGS, and MOORE, Circuit Judges.**

**PER CURIAM**.  Defendant-Appellant Farid Mohammed appeals his jury conviction and sentence for possession of heroin with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), (b)(1), and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i).  Mohammed argues that: (1) the search of his apartment was unconstitutional; (2) the district court abused its discretion in denying his request to file a second motion to suppress challenging probable cause for his arrest; (3) there was insufficient evidence to support his firearm conviction; (4) hearsay testimony at trial violated his Sixth Amendment right to confrontation; (5) photographs were improperly admitted into evidence; (6) his statement to the police denying that he had drugs on his person violated his Fifth Amendment right to an attorney; (7) he was entitled to a reliability hearing to test the veracity of a jailhouse informant; (8) the Government violated his Sixth Amendment right to counsel by using a jailhouse informant to elicit incriminating statements; and

(9) his sentence was both procedurally and substantively unreasonable.  For the following reasons,

we **AFFIRM.**

I.

A.

On July 21, 2009, the Central Vice Control Section of the Cincinnati Police Department conducted a "buy-bust operation," intending to arrest Defendant-Appellant Farid Mohammed after police surveillance revealed a drug transaction between Mohammed and a confidential informant. The informant told Cincinnati police officers that Mohammed, operating under the alias "Quan," had heroin available for purchase.  The informant revealed to police officers that: (1) Mohammed lived in an apartment on 2704 Eden Avenue; (2) Mohammed drove a silver Mercedes Benz and a blue Lexus; (3) the informant arranged for Mohammed to deliver heroin to a lot behind a Shell gas station on Ohio Avenue; and (4) Mohammed would arrive at the Shell gas station in his silver Mercedes Benz.  One of several recorded phone conversations captured the informant asking Mohammed whether he was "ready to do the car th[i]ng."  Mohammed responded by asking, "You got it?"  The informant then told Mohammed, "I got the car.  We gotta probably go get the title . . . ."  The informant then inquired if he and Mohammed were "still gonna do the same thing we talked about." Mohammed replied, "Yeah, yeah, same thing."  Another recorded conversation captured similarly coded dialogue expressing an intention to "do the car th[i]ng," although none of the recorded conversations captured any express mention of drugs.

Around 6:25 p.m. on the evening of July 21, 2009, Mohammed drove to the Shell station parking lot in a silver Mercedes Benz with a passenger. After Mohammed arrived, Officer Howard Fox drove the informant to the parking lot in a blue Cadillac. Upon noticing the Cadillac, Mohammed waved his hands and began walking towards the Cadillac. As Mohammed reached his hand out to open the Cadillac door, Officer Fox drove away and the other officers moved in to arrest Mohammed. The arresting officers first asked whether Mohammed had any drugs or weapons on his person. Mohammed denied having drugs or weapons. The officers read Mohammed the *Miranda* warnings and questioned him about his car. Mohammed indicated to the officers that he had a gun in his car. After conducting a search of Mohammed and his car, the officers recovered a set of keys from Mohammed's person and a loaded .45-caliber handgun from the center console of the backseat of Mohammed's car. Officers then asked Mohammed where he resided. Mohammed, not mentioning his Eden Avenue apartment, claimed to reside in New Jersey while sometimes staying in West Chester, Ohio. The officers conducted a K9 sniff of the Mercedes Benz. When Officer Brian Trotta directed the drug K9 around the vehicle, the drug K9 gave a clear and aggressive indication on the driver and passenger side doors; however, no drugs were found during the search of the Mercedes Benz.

The officers went to 2704 Eden Avenue and located Mohammed's blue Lexus parked at the intersection of Charlton Avenue and Eden Avenue. The officers conducted a K9 sniff of the Lexus and the same drug K9 gave a clear and aggressive indication on the driver-side and passenger-side doors. The officers used the keys they had seized from Mohammed to enter the common entry door of the apartment building at 2704 Eden Avenue. Once inside the common area of the apartment

building, the officers again conducted a drug K9 sniff of the door of Apartment 2, where Mohammed resided. The same drug K9 that conducted the other two drug sniffs again gave a clear and aggressive indication on the apartment door.

Based on the foregoing information, the officers obtained a search warrant to search Mohammed's apartment. During the search, the officers recovered a total of 883.61 grams of heroin. The officers found heroin pellets in the bedroom vent, the bedroom closet, and a shoebox in the family room. Officers also recovered a digital scale, a kilo wrapper, and ammunition of the same make and model that was in the firearm recovered from the Mercedes Benz.

## B.

On August 5, 2009, Mohammed was indicted on one count of possession with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).

On October 19, 2009, Mohammed filed a motion to suppress all evidence obtained at his apartment, claiming that the officers' warrantless entry into the common area of his apartment building violated the Fourth Amendment. The district court denied the motion on November 25, 2009, finding that although the officers' entry into the common area violated the Fourth Amendment—based on our ruling in *United States v. Carriger*, 541 F.2d 545 (6th Cir. 1976)—there was sufficient probable cause to support the search warrant when the tainted portions of the search warrant were excised.

On January 27, 2010, after the official drug weight revealed that the total amount of heroin was less than one kilogram, a federal grand jury returned a superseding indictment that charged Mohammed with possession with intent to distribute one hundred grams or more of heroin in

violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). The superseding indictment also added a new charge of possessing a firearm in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i).

On March 1, 2010, Mohammed filed his second motion to suppress, challenging his arrest, the subsequent search of his car, and his statements claiming ownership of the gun. The district court denied the motion based on Mohammed's failure to raise such issues in his first motion to suppress.

After a jury convicted Mohammed on both counts, he filed a motion for judgment of acquittal, claiming that there was insufficient evidence for the jury to find him guilty of possessing a firearm in furtherance of a drug-trafficking crime. The court denied the motion and sentenced Mohammed to a total of 157 months in prison. This appeal followed.

II.

Mohammed raises numerous issues on appeal. We address each one in turn.

### *Search of Mohammed's Apartment*

Mohammed argues that the district court erred in failing to suppress all evidence obtained during the search of his apartment. The district court found that the officers' entry into the locked common area of Mohammed's apartment building prior to obtaining a search warrant was unconstitutional. The court concluded, however, that when all the evidence obtained from the unconstitutional entry was excised from the search warrant—namely the testing of the lock on the apartment door and the K9 sniff at Mohammed's door—the warrant was still supported by probable cause. At oral argument, Mohammed asserted for the first time that the district court erred in

concluding that untainted portions of the search warrant supported a finding of probable cause because the untainted portions of the search warrant did not indicate Apartment 2 as the subject apartment to be searched. The Government contends that Mohammed lacks standing to challenge the search of the apartment after purportedly disclaiming knowledge of the building.

We review a district court's denial of a motion to suppress for clear error as to factual findings and *de novo* as to conclusions of law. *United States v. Howard*, 621 F.3d 433, 450 (6th Cir. 2010).

As an initial matter, we find that the district court correctly applied our holding in *Carriger* to conclude that the police officers unconstitutionally entered the locked common area of Mohammed's apartment building without a warrant. In *Carriger*, we held that a tenant in an apartment building has a reasonable expectation of privacy in the common areas of the building not open to the general public and that an officer's entry into a locked apartment building without consent or a warrant constitutes an illegal entry in violation of the Fourth Amendment. *Carriger*, 541 F.2d at 549-50. When the officers entered into the locked common area of 2704 Eden Avenue without permission, exigency, or a warrant, they effected an unconstitutional search based on the principle set forth in *Carriger*. *See United States v. Heath*, 259 F.3d 522, 534 (6th Cir. 2001). We have since repeatedly applied the reasoning and holding of *Carriger* as controlling law. *See, e.g.*, *United States v. Dillard*, 438 F.3d 675, 683 (6th Cir. 2006); *Heath*, 259 F.3d at 533; *United States v. Salgado*, 250 F.3d 438, 456 n.3 (6th Cir. 2001); *United States v. Kimber*, 395 F. App'x 237, 246

(6th Cir. 2010). We decline to disturb this well-settled law even though "[t]he United States believes that *Carriger* and *Heath* were incorrectly decided."[1] Appellee Br. at 30.

We next evaluate whether the district court properly applied the independent-source rule. Under the independent-source rule, evidence obtained pursuant to an unconstitutional search will be admitted if the Government shows that it was discovered through sources wholly independent of any constitutional violation. *United States v. Jenkins*, 396 F.3d 751, 757 (6th Cir. 2005). "[P]olice who carry out a search that they should not have carried out should be put in the same, *but no worse*, position than they would have been absent any error or misconduct." *Id.* at 758 (emphasis in original). Where, as in this case, a warrant was obtained based upon information learned through an improper search, courts consider whether the application for a warrant contains probable cause apart from the tainted information. *Id.* at 760. Here, this inquiry requires excising the tainted information learned through the unconstitutional entry into Mohammed's apartment building: (1) that the drug K-9 alerted at the door of Apartment 2, and (2) that the keys obtained from Mohammed corresponded with the lock on the Apartment 2 door.

We conclude that the untainted information contained in the warrant still supports a finding of probable cause—a "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005) (quoting *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (en banc)). We consider, based on a

---

[1] Indeed, it is beyond our province to reconsider *Carriger* and *Heath*, for it is well established that "[a] published prior panel decision 'remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.'" *Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009) (quoting *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985)).

practical, common-sense decision, whether the circumstances set forth in the affidavit established

a fair probability that contraband or evidence of a crime would be found in Apartment 2. *See United*

*States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-

39 (1983)). To justify a search, there must be a "nexus between the place to be searched and the

evidence sought." *Carpenter*, 360 F.3d at 594. "[A]n issuing judge may infer that drug traffickers

use their homes to store drugs and otherwise further their drug trafficking." *United States v.*

*Williams*, 544 F.3d 683, 687 (6th Cir. 2008).

With the assistance of a confidential informant, the police had recorded phone conversations

in which Mohammed and the confidential informant purportedly arranged for the delivery of an

amount of heroin. Nearly all of the informant's information was corroborated by subsequent events.

The informant told the officers that he and Mohammed had arranged for the delivery of heroin and

that Mohammed would arrive in a newer silver Mercedes Benz. On the night of the "buy-bust,"

although Mohammed did not possess heroin, he did arrive at the predetermined location driving a

2002 silver Mercedes Benz. A trained and reliable[2] drug K9 alerted officers of the presence of the

odor of drugs on Mohammed's Mercedes, and later on the blue Lexus. The confidential informant

also correctly informed the officers of Mohammed's residence at 2704 Eden Avenue.

Mohammed argues that the untainted affidavit does not support a finding of probable cause

because there would be no information that would link Mohammed to Apartment 2. We disagree.

It is true that by engaging the key in the tumbler, the officers were able to confirm that Mohammed

was linked to Apartment 2; however, this does not mean that the officers did not have reason to

---

[2]The district court made an express finding that the drug K9 was reliable. R. 21 at 15.

believe that Mohammed lived in Apartment 2 apart from this confirmation. To the contrary, Officer Schaible testified at the suppression hearing that in using Mohammed's keys to unlock Apartment 2, the officers were "attempting to corroborate the information that [they had] received that Mr. Mohammed resided at that apartment . . . ." It is also apparent from the record that the officers did not use Mohammed's keys in a fishing expedition to find which apartment he resided in, but instead went directly to Apartment 2. Mohammed points to no evidence suggesting otherwise. Therefore, we do not excise the fact that Mohammed lived in Apartment 2 because it has not been shown to be information"tainted" by the officers' illegal entry.

Mohammed also attacks the search warrant for failing to establish the confidential informant's history of reliability. "When confronted with hearsay information from a confidential informant, 'a court must consider the veracity, reliability, and the basis of knowledge for that information as a part of the totality of the circumstances for evaluating the impact of that information . . . .'" *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005) (quoting *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003)). While the warrant does not speak to the informant's history or past relationship with officers, the veracity of the information is sufficiently established by the subsequent events corroborating the informant's information.

We conclude that the untainted affidavit contains sufficient probable cause to justify the search of Mohammed's apartment. We therefore affirm the district court's judgment denying the motion to suppress.[3]

---

[3]Because we find that the independent-source rule saves the search warrant, we do not address the Government's alternative arguments for affirmance: that Mohammed lacked standing to challenge the search, and that the officers acted in good faith reliance on the search warrant. We

***Second Motion to Suppress***

Mohammed contends that the district court abused its discretion when it dismissed his second pretrial motion to suppress, which was filed after he was charged in a superseding indictment. We agree that the district court abused its discretion and should have considered Mohammed's second motion to suppress. When the grand jury returned a superseding indictment three months after Mohammed filed his first motion to suppress, Mohammed was faced with the new charge of possessing a firearm in furtherance of a drug-trafficking crime, which carried a five-year consecutive sentence. Mohammed filed a second motion to suppress on March 1, 2010, and, for the first time, challenged probable cause for his arrest and the search of his vehicle. However, pursuant to Rule 12(c) of the Federal Rules of Criminal Procedure, the district court established the deadline for filing pretrial motions to be October 21, 2009.

In dismissing Mohammed's second motion to suppress, the district court reasoned that Mohammed had "the opportunity and obligation" to challenge the probable cause for his arrest and car search during his first motion to suppress filed on October 19, 2009. The district court found Mohammed's case to be "almost identical" to *United States v. Jones*, No. 3:07-CR-162, 2009 WL 973206, (E.D. Tenn. April 9, 2009), where the district court similarly denied leave to file a post-deadline, pretrial motion to suppress based on the defendant foregoing an opportunity to raise the

---

note, however, that this court has never held that disclaiming residency at a particular place extinguishes standing to challenge an unconstitutional search of that residence. Moreover, it is unclear to what extent Mohammed actually disclaimed his connection with 2704 Eden Avenue in his circuitous and misleading answers to the officers' questions. *See United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995) ("[A] misleading response to an officer's question is a far cry from a consent to search."). In fact, the district court acknowledged that Mohammed ultimately conceded that he lived on Eden Avenue. R. 73 at 8.

challenged issues before the deadline. We find the *Jones* case to be distinguishable from Mohammed's case. In *Jones*, the defendant had originally filed a pretrial motion to suppress, alleging an illegal detention, search, and arrest. The defendant thereafter filed an untimely motion to suppress both the evidence seized in the same traffic stop at issue in the original motion, and evidence seized as a result of a dog sniff. The only discernable explanation for the defendant's untimely motion was to allow the defendant's third appointed counsel to relitigate the pretrial motions filed by the defendant's first attorney. The district court ultimately denied leave to file the untimely motion to suppress, citing strong policy considerations supporting that decision. *See id.* at *4.

Here, Mohammed had the opportunity to challenge his arrest and car search during his first motion to suppress, but he did not have the obligation to do so. Mohammed's counsel understandably focused on challenging the search of the apartment, which formed the basis of Mohammed's then-sole charge of possessing heroin with an intent to distribute. It was not until the grand jury returned a superseding indictment adding a firearm charge that the search of his car, which produced the firearm and no heroin, became relevant. Rule 12(e) of the Federal Rules of Criminal Procedure provides that a defendant waives a motion to suppress for failing to raise it before the deadline set by the district court; however, "[f]or good cause, the court may grant relief from the waiver." Fed. R. Crim. P. 12(e). At a minimum, good cause requires a party to "articulate some legitimate explanation for the failure to timely file." *United States v. Walden*, 625 F.3d 961, 965 (6th Cir. 2010). Here, we find "good cause" to include a situation where the failure to raise a pretrial motion to suppress is based on its legal irrelevance to the pending charges.

Although we believe that the district court abused its discretion in denying Mohammed the opportunity to file a second motion to suppress, we conclude that the error was harmless. *See* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). As noted by the district court, the events that supported a finding of probable cause to search Mohammed's apartment largely coincide with probable cause to arrest Mohammed, which in turn allowed the police to search his car incident to the arrest. Probable cause to arrest Mohammed was based on the corroborated testimony of the informant, as discussed earlier.

### Mohammed's Motion for Acquittal

Mohammed challenges the sufficiency of evidence leading to his conviction on possession of a firearm in furtherance of a drug-trafficking offense. "When the sufficiency of the evidence is challenged on appeal, the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime." *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996) (quotation marks and citations omitted). The court makes "all reasonable inferences and credibility choices in support of the jury's verdict." *United States v. Springer*, 609 F.3d 885, 891 (6th Cir. 2010) (quotation marks and citations omitted). The jury instructions read:

> In order to establish that the Defendant is guilty of this offense, the government must prove beyond a reasonable doubt each of the following essential elements:
>
> First: That the Defendant committed the drug trafficking crime charged in Count 1, for which he is being prosecuted in a court of the United States;
>
> Second: That the Defendant knowingly possessed a firearm; and

> Third: That the Defendant possessed the firearm in furtherance of the drug trafficking crime charged in Count 1.

The jury was further instructed that the presence of a firearm cannot be the result of accident or coincidence, and in finding that the firearm was possessed "in furtherance of," the jury could consider whether the gun was loaded, the legality of its possession, and the time and circumstances under which the firearm was found. *See United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001). "By requiring that the possession be 'in furtherance of' the drug crime, Congress intended a specific nexus between the gun and the crime charged." *Id.* The firearm must be "strategically located so that it is quickly and easily available for use." *Id.*

Mohammed argues that because the handgun was found in his car, a considerable distance from the heroin recovered from his apartment, the evidence presented at trial was insufficient to show that the possession of the handgun was "in furtherance" of a drug-trafficking crime. We disagree.

A rational jury viewing the evidence in the light most favorable to the prosecution had ample evidence upon which they could find that Mohammed possessed the firearm in furtherance of drug trafficking. The jury heard testimony and recorded calls suggesting that Mohammed was going to sell heroin to a confidential informant. Mohammed brought a loaded .45-caliber Taurus handgun to meet the confidential informant at a predetermined location for a purported drug transaction. Officer Hubbard testified that the handgun recovered from the center console in the backseat was "very accessible" to Mohammed because the car was a two-door car. Additionally, the jury heard testimony from several officers that drug dealers commonly possess and carry firearms to protect

themselves and their narcotics.[4]  Although heroin was not recovered from Mohammed's Mercedes at the buy-bust, a drug sniff by the K9 indicated the scent of drugs on the Mercedes, where the Taurus was recovered.  The jury also heard testimony that Mohammed had heroin in his vehicle but decided to take the drugs back to his apartment at the last minute.  Police officers recovered more than 800 grams of heroin from Mohammed's apartment.  In the same apartment, the police recovered a loaded magazine that matched the Taurus handgun recovered from Mohammed's vehicle.  Moreover, the jury saw photographs of Mohammed posing in his apartment with a large amount of cash and a handgun resembling the Taurus handgun recovered from his car.  The presence of drugs, a handgun, and a large amount of cash would allow a rational jury to conclude that Mohammed used the handgun for protection in conducting drug sales.  Further, a rational jury could conclude that the gun was strategically located in the Mercedes so as to be easily accessible to Mohammed in furtherance of his drug sale.  We therefore affirm the district court's denial of Mohammed's motion for acquittal.

### *Mohammed's Motion for a Mistrial Based on the Confrontation Clause*

Mohammed argues that his Sixth Amendment right to confrontation was violated when prosecutors introduced hearsay testimony of a confidential informant who did not testify at trial.  He thus contends that the district court abused its discretion by not granting a mistrial.  Mohammed claims that prosecutors purposely elicited the informant's hearsay testimony from police officers

---

[4]Mohammed cites *Mackey* to discount police testimony on this point, but Mohammed's reliance on *Mackey* is misplaced. *Mackey* only counsels that "*standing on its own*, [police testimony regarding drug dealers' use of firearms] *may* be insufficient to meet the 'in furtherance of' test." *Mackey*, 265 F.3d at 462 (quoting H.R. Rep. No. 105-344, 1997 WL 668339 at *12) (emphasis added).  Here, the police testimony certainly was not the sole consideration by the jury.

when they had knowledge, before the presentation of opening statements, that they would not call the confidential informant to testify.

We review an evidentiary ruling related to claimed violations of the Confrontation Clause *de novo*. *United States v. Robinson*, 389 F.3d 582, 592 (6th Cir. 2004). The Government contends that Mohammed failed to object to certain statements and that we should therefore review for plain error. *See United States v. Hadley*, 431 F.3d 484, 498 (6th Cir. 2005). However, a review of the record reveals that Mohammed's attorney did indeed make numerous objections to the admission of testimony based on the sole knowledge of a non-testifying confidential informant. As such, we review Mohammed's claims *de novo*. Testimonial out-of-court statements offered to establish the truth of the matter asserted are admissible only when (1) the declarant is unavailable and (2) the defendant had a prior opportunity to cross-examine the declarant. *See Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). "[S]tatements of a confidential informant are testimonial," *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004), however, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted," *Crawford*, 541 U.S. at 59 n.9.

Mohammed cites as error the admission of the following testimony elicited by the Government during the examinations of Officers Fox, Schaible, and Hubbard: (1) Mohammed's nickname is "Quan"; (2) Mohammed was the voice on the other end of the recorded phone calls with the informant; (3) Mohammed and the informant negotiated a deal to exchange the Cadillac and money for heroin; (4) the drug deal was to take place in the gravel lot of the Shell Gas Station; (5) the gravel lot was the place where Mohammed and the informant met before; (6) the drug transaction

was to be for one hundred grams of heroin; and (7) Mohammed is a large-scale drug dealer. The third through seventh enumerated statements were objected to, the objection was sustained, and the statements were stricken from the record. The district court also instructed the jury to disregard each of the statements that were stricken from the record. "The assumption that jurors are able to follow the court's instructions fully applies when rights guaranteed by the Confrontation Clause are at issue." *Tennessee v. Street*, 471 U.S. 409, 415 n.6 (1985). This presumption is overridden "only when there is a strong likelihood that the effect of the evidence would be devastating to the defendant and . . . there is an overwhelming probability that the jury will be unable to follow the court's instructions." *Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000) (internal quotation marks and citations omitted). Here, there is neither a "strong likelihood" that the effect of the stricken testimony was devastating to Mohammed's defense nor an "overwhelming probability" that the jury was unable to follow the court's directive.

The first two statements that were not stricken from the record violate the Confrontation Clause. *See United States v. McGee*, 529 F.3d 691, 698 (6th Cir. 2008) (finding a Confrontation Clause violation where police testified to a confidential informant's out-of-court statements identifying the defendant as the person he talked to on the phone and with whom he arranged the drug deal). The statements were testimonial, *see Cromer*, 389 F.3d at 675, because the confidential informant communicated the statements to the police anticipating their use against Mohammed during the pending investigation and subsequent prosecution. The statements were also out-of-court statements used to prove the truth of the matter asserted—that Mohammed's street name was "Quan," and that his voice was captured in the recorded phone calls. It is undisputed that

Mohammed did not have a prior opportunity to cross-examine the confidential informant. Violations of the Confrontation Clause, however, are subject to harmless-error analysis. *McGee*, 529 F.3d at 697 (citing *Chapman v. California*, 386 U.S. 18, 22-23 (1967)). "Errors are harmless in terms of their effect on the factfinding process at trial where the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Id.* (quotation marks and citations omitted). In determining whether an error was harmless, courts consider: (1) the importance of the witness's testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted, and (5) the overall strength of the prosecution's case. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

The testimony that Mohammed went by the alias "Quan" was not a critical fact in the prosecution's case. However, the identification of Mohammed as the voice on the recorded tapes was important to the prosecution's case to the extent that the recorded conversations suggest that a drug sale was to occur at the Shell station between the two people conversing. Yet, as helpful as it may have been, this evidence was not indispensable to the prosecution's case because there was other corroborating evidence indicating that Mohammed intended to sell heroin to the confidential informant at the Shell gas station. For example, Sami Elias, a jailhouse informant, testified that Mohammed told him how he initially planned to meet the confidential informant with the heroin, but then changed his mind last minute and left the heroin at his apartment. Additionally, the large amount of heroin located at Mohammed's apartment together with the evidence that Mohammed arrived at the Shell station, waved his arm upon seeing the Cadillac, and moved to open the Cadillac

door, further supports the conclusion that Mohammed was the person the confidential informant communicated with in the recorded phone conversations. In light of the whole record, we conclude that the Confrontation Clause errors were harmless, and the district court therefore did not err by not declaring a mistrial.

### *Prosecutorial Misconduct*

Mohammed alleges that the Government engaged in prosecutorial misconduct during its opening statement and throughout the trial by purposely eliciting hearsay statements from its witnesses when it knew that the confidential informant was unavailable. A district court's denial of a motion for mistrial based on prosecutorial misconduct is reviewed for an abuse of discretion. *United States v. White*, 563 F.3d 184, 193 (6th Cir. 2009). We first look at whether the prosecutor's behavior was improper. *Id.* We then evaluate whether the remarks were flagrant and warrant reversal. *Id.* "To determine the flagrancy of the prosecutor's remarks, we look at (1) whether the statements tended to mislead the jury and prejudice the defendant; (2) whether the statements were isolated or pervasive; (3) whether the statements were deliberately placed before the jury; and (4) whether the evidence against the accused is otherwise strong." *Id.*

Mohammed contends that during opening statements, the Government stated that the jury would hear evidence that Mohammed arranged to sell drugs in exchange for a car and money. Mohammed alleges that the Government made this comment knowing that the confidential informant would not testify. This argument is without merit. The Government has maintained that at the time of opening statements, it reasonably expected that the confidential informant would

testify.  In response to Mohammed's allegations that the Government engaged in prosecutorial

misconduct, both during opening statements and throughout the trial, the district court observed:

> I don't think the jury has been misled nor the accused prejudiced, and I am reasonably convinced that the government's counsel did not deliberately mislead the jury and had a reasonable expectation that the confidential informant might be produced.  But even in the event that he wasn't produced, that was not critical to the government's case.
>
> As we look back now, the case is strong against the Defendant.  At the time the [motion for a mistrial] was filed, it was two hours of testimony under our belts, shall we say, and the only the second witness.
>
> . . .
>
> And I do agree with [the Government] that [*Frazier v. Cupp*, 394 U.S. 731 (1969)] is very close to our circumstances here.  That was a case in which a rather important witness at the last minute decided to stand on his Fifth Amendment rights and not testify, which the government did not anticipate in that situation.  And the court found that the prosecutor had acted in good faith with the expectation that the witness would testify, and the [Supreme Court] concluded the evidence presented on the record was sufficient to support the conviction.
>
> So the motion is denied. . . .

R. 78 at 161-63.

The district court accurately described the Supreme Court's holding in *Frazier* and did not

abuse its discretion by finding that the circumstances in *Frazier* were similar to the circumstances

in Mohammed's case.  To counter, Mohammed points to a colloquy between the Government and

the district court in which the Government explained that it received a last-minute call from the

confidential informant's attorney, who stated that the confidential informant would not testify.  The

Government explained that, even at that point, it was still hopeful that the informant would testify,

but those hopes just failed to materialize.  Mohammed has not pointed to any evidence suggesting

that the Government falsified this explanation, or otherwise acted in bad faith.  Therefore, we find

that the district court did not abuse its discretion in denying Mohammed's motion for mistrial due to prosecutorial misconduct.

***Admission of Photographs of Mohammed with Money and a Gun***

Mohammed next claims that the district court abused its discretion in admitting into evidence three photographs of Mohammed posing with a stack of money and a gun sticking out of his pocket. In all three photographs Mohammed was standing in his apartment. The photographs were recovered from a digital camera that was found in Mohammed's apartment during the search. Mohammed argues that the photographs were substantially more prejudicial than probative and should not have been admitted. *See* Fed. R. Evid. 403. Mohammed argues that the photos were admitted for "the sole purpose of getting the jury to believe that the gun had been in the apartment with the drugs at some other time." Appellant's Br. at 48. He further claims that the photos risked provoking an emotional reaction from the jury as they depicted "an African American male with a gun and striking a gangster pose." *Id.*

The district court is "granted very broad discretion in determining whether the danger of undue prejudice outweighs the probative value of the evidence." *United States v. Mack*, 258 F.3d 548, 555 (6th Cir. 2001) (internal quotation marks and citation omitted). Here, the district court did not abuse its broad discretion. We are not convinced that the photographs' probative value was "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. The photographs were relevant to both the § 841 and the § 924(c) counts because they purportedly: (1) identified the Taurus handgun found in the Mercedes Benz as belonging to Mohammed, whereas Mohammed had suggested at trial that the firearm found in his car may have belonged to the passenger; (2) showed

that Mohammed possessed large amounts of cash; and (3) connected the large amount of cash and a firearm to the apartment where the heroin was found. Further, we have recognized that "firearms, as tools of the drug-trafficking trade, are probative evidence in drug prosecutions." *United States v. Wheaton*, 517 F.3d 350, 364 (6th Cir. 2008). Mohammed does not cite any countervailing prejudice that indicates the district court abused its discretion in admitting the photographs. Accordingly, we affirm the district court.

### Mohammed's Pre-Miranda Statements

Mohammed argues that the district court erred in denying a motion to suppress statements that he claimed were made in violation of his Fifth Amendment rights. We review the denial of a motion to suppress for clear error as to factual findings and *de novo* as to conclusions of law. *United States v. Simpson*, 520 F.3d 531, 534 (6th Cir. 2008). The district court found that Officer Schaible placed Mohammed in handcuffs and, before conducting a pat down, asked Mohammed whether he had any weapons, drugs, or anything sharp that would stick him. Mohammed denied having any contraband. Thereafter, the officer conducted a pat-down search, and then read the *Miranda* warnings to Mohammed. After Mohammed indicated that he understood the *Miranda* warnings, the officer asked Mohammed if there were any drugs or weapons in his car, to which Mohammed replied that there was a gun in the backseat console. Mohammed contests only the failure to suppress his pre-*Miranda* statement that he had no drugs on his person.

"[W]hen officers ask questions 'necessary to secure their own safety or the safety of the public' as opposed to 'questions designed solely to elicit testimonial evidence from a suspect,' they do not need to provide the warnings required by *Miranda*." *United States v. Williams*, 483 F.3d 425,

428 (6th Cir. 2007) (citing *New York v. Quarles*, 467 U.S. 649, 659 (1984)). This "public-safety exception" applies "when officers have a reasonable belief based on articulable facts that they are in danger." *Id.* (internal quotation marks omitted). In *Williams*, we established that an officer's belief that he is in danger is reasonable only if the officer has reason to believe "(1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it." *Id.*

The district court concluded "Officer Schaible had a reasonable belief that Defendant presented a safety threat," by reasoning that "it is generally recognized that drug traffickers have a propensity to carry weapons," R.38 at 4 (citing *United States v. Williams*, 272 F. App'x 473, 477-78 (6th Cir. 2008)). We agree with the district court's conclusion that Officer Schaible had a reason to believe that Mohammed, by the nature of his suspected drug dealing, had a weapon readily accessible. This reasonable belief would warrant the officer's questions regarding a weapon, but we have not specifically addressed if questions about whether a suspect is carrying drugs or drug paraphernalia, in anticipation of a pat down, are permissible under the public-safety exception. Other circuits that have addressed this issue have found that these type of preliminary questions are appropriate under the public-safety exception. *See United States v. Reyes*, 353 F.3d 148, 152-53 (2d Cir. 2003) (collecting cases) (upholding under the public-safety exception an officer's question, just before a pat down, whether a suspected narcotics dealer had anything in his pocket that could hurt the officer, where the question was limited to objects located on the suspect's person and prompted by a reasonable concern for the officer's safety); *United States v. Lackey*, 334 F.3d 1224, 1227-28 (10th Cir. 2003) (officer's question before a pat down whether a suspect had guns or anything sharp

on his person was proper under the public-safety exception as the question addressed a real and substantial risk of injury during a routine search or frisk); *United States v. Carrillo*, 16 F.3d 1046, 1049-50 (9th Cir. 1994) (officer's question if suspect had drugs or needles on his person met public-safety exception because it stemmed from objectively reasonable need to protect himself). "Firearms and sharp objects, such as razor blades and hypodermic needles, are 'tools of the drug trade' regularly found on narcotics traffickers." *Reyes*, 353 F.3d at 154. Similarly to other circuits, we conclude that the officer's question whether Mohammed, a suspected heroin dealer, had drug paraphernalia on his person that could harm the officer in conducting a routine pat down stems from an objectively reasonable concern for the officer's safety. Accordingly, we find that the officer's question was proper under the public-safety exception to the extent that it asked about weapons or other harmful objects. Even if we were to conclude otherwise, the admission of Mohammed's statements in response to the officer's pre-*Miranda* question pertaining to whether Mohammed had drugs or anything that could "stick" the officer are harmless. Mohammed responded to the officer's question in the negative. Surely, the admission of a statement that Mohammed did not possess drugs or drug paraphernalia on his person does not prejudice his defense.

## *A Reliability Hearing on Jailhouse Informant*

Mohammed argues that the district court abused its discretion in refusing to hold a reliability hearing on jailhouse informant Sami Elias. We review a district court's decision to deny an evidentiary hearing for an abuse of discretion. *Abdus-Samad v. Bell*, 420 F.3d 614, 626 (6th Cir. 2005). On the morning of trial, May 24, 2010, Mohammed made a motion to voir dire the jailhouse informant out of the presence of the jury to determine his reliability. The district court made a

"tentative ruling" not to permit a reliability hearing and advised the parties that "if something develops in the course of the trial, [the court] would revisit that issue." R. 76. at 40. Mohammed failed to renew a motion for a reliability hearing.

Elias wrote a letter to the federal prosecutor offering valuable testimony, hoping to receive the Government's support for an early termination of federal supervision during his probation. Elias testified that he was assigned to the same unit as Mohammed and that the two of them had conversations relating to Mohammed's charges. Elias claimed that Mohammed revealed how he planned to meet the confidential informant to sell him heroin, but had changed his mind at the last second about his decision to carry the heroin to the meeting. Mohammed cross-examined Elias, exposing Elias's multiple felony convictions and desire to receive favorable consideration in a pending matter. Other than these traditional considerations of witness credibility, Mohammed does not point to any particular circumstance that would compel the district court to hold a reliability hearing. Further, Mohammed points to no case law from this circuit that requires the district court to hold a reliability hearing for a jailhouse informant, nor any case law in which we have found an abuse of discretion for failing to hold a reliability hearing. The jury was allowed to weigh critical aspects of the jailhouse informant's credibility in rendering a verdict. We see no reason to disrupt their verdict. In this case, the district court did not abuse its discretion in denying Mohammed a reliability hearing. This conclusion is bolstered by the fact that Mohammed failed to renew his motion for a reliability hearing.

***Jailhouse Informant and Mohammed's Sixth Amendment Right to Counsel***

Mohammed next claims that the "Government intentionally created a situation likely to violate Mohammed's Sixth Amendment rights when it kept Elias housed in the same unit with Mohammed after Elias contacted the Government about wanting to cooperate in exchange for leniency." Appellant's Br. at 54. Because Mohammed did not argue this claim in the district court, it is subject to plain-error review. *United States v. McAuliffe*, 490 F.3d 526, 539 (6th Cir. 2007). "[O]nce a defendant's Sixth Amendment right to counsel has attached, he is denied that right when federal agents 'deliberately elicit' incriminating statements from him in the absence of a lawyer." *Kuhlmann v. Wilson*, 477 U.S. 436, 457 (1986). In *Kuhlmann*, the Supreme Court observed:

> Since the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached[] a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Id.* at 459 (internal quotation marks and citations omitted). We have held that absent "direct written or oral instructions by the State to a jailhouse informant," agency is determined by analyzing "the facts and circumstances of a particular case to determine whether there exists an express or implied agreement between the State and the informant." *Ayers v. Hudson*, 623 F.3d 301, 311-12 (6th Cir. 2010).

Under a plain-error review, Mohammed cannot demonstrate that the Government worked with Elias to "deliberately elicit" incriminating statements from him. To the contrary, Mohammed voluntarily discussed his circumstances with Elias, and only afterwards did Elias use this information

as bargaining power by writing a letter to the Government explaining the valuable information that he had. The Government contends that Elias wrote an unsolicited letter to the Assistant United States Attorney handling Mohammed's case, and that the AUSA had no knowledge of Elias prior to receiving his letter. Appellee Br. at 68. There had been no previous relationship between Elias and the Government because prior to Mohammed's case, Elias had never been a jailhouse informant. *Id.* Mohammed does not proffer evidence to rebut the Government's contentions. There is no indication in the record that Elias obtained information from Mohammed after meeting with the AUSA. Moreover, nothing in the record suggests that Elias's trial testimony is based on information obtained after sending his letter to the AUSA. In the absence of evidence to the contrary, we find no plain error.

### Sentencing: Procedural and Substantive Unreasonableness

Mohammed claims that his sentence was both procedurally and substantively unreasonable. We review a sentence for procedural and substantive reasonableness using an abuse-of-discretion standard of review. *Gall v. United States*, 552 U.S. 38, 46 (2007). A sentence within the Guidelines range is presumptively reasonable. *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008). Mohammed was sentenced to 157 months of imprisonment, which represented the bottom of the Guidelines range. Mohammed claims the court erred by not giving adequate consideration to the fact that failed plea negotiations resulted in a superseding charge for firearm possession. The district court observed:

> [I]t occurs to me that perhaps the government offered as a part of the Plea Agreement
> that they would not charge your client with the gun count. And when he rejected the

> Plea Agreement, the gun charge was, in fact, taken to the grand jury and added to the charges pending, which doesn't sound terribly vindictive to me. . . .

R. 80 at 7. We agree with the district court, as our case law supports the conclusion that the Government did not act vindictively. *See United States v. DeJohn*, 368 F.3d 533, 545 (6th Cir. 2004) ("This Circuit has consistently indicated that when the right asserted by the defendant is simply the right to go to trial, an additional charge entered after a failed plea bargain cannot . . . form the substance of a viable vindictive prosecution claim."). Accordingly, we reject Mohammed's argument.

Mohammed also claims that his sentence was substantively unreasonable because the court failed to vary downward from the Guidelines range based on Mohammed's arguments that his immigration status: (1) requires him to spend a longer amount of time in prison than a similarly situated United States citizen, who, unlike Mohammed, would potentially be eligible for a halfway house; and (2) makes him ineligible for minimum-security prison. The district court noted that deportation is mandatory and permanent for felony drug convictions. The district court also recognized that because Mohammed is a deportable alien, he is subject to more restrictive terms of confinement. The court further acknowledged that his status as a deportable alien could be, in some cases, an appropriate basis for departure, but reasoned that it was not appropriate in Mohammed's case because his possession of a large amount of narcotics and possession of a firearm could independently render him ineligible for a minimum-security prison. The district court also reasoned that because halfway houses are intended for inmates who are about to re-enter the community, and Mohammed as a deportable alien would not re-enter the community regardless of the length of his

sentence, it did not feel compelled to grant Mohammed a downward variance. Ultimately, the district court concluded that the mitigation factors proffered by Mohammed were not compelling and were "substantially outweighed by the seriousness of his conduct." R. 80 at 14. We find that the district court properly considered Mohammed's mitigation arguments and did not abuse its discretion in declining to depart downward from the bottom of the Guidelines range.

III.

For the foregoing reasons, we **AFFIRM** the judgment of the district court.